# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### NORTHERN DIVISION

LINDA K. JACKSON,                          )
                                           )
                    Plaintiff,             )
                                           )
        v.                                 )        No.  2:14-CV-22 NAB
                                           )
CAROLYN W. COLVIN, Acting                  )
Commissioner of Social Security,           )
                                           )
                    Defendant.             )

## MEMORANDUM AND ORDER

Plaintiff Linda K. Jackson brings this action under 42 U.S.C. § 405(g) for

judicial review of the Commissioner's final decision denying her application for

disability insurance benefits (DIB) under Title II of the Social Security Act, 42

U.S.C. §§ 401, *et seq.*  All matters are pending before the undersigned United

States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. §

636(c).  Because the Commissioner's final decision is not supported by substantial

evidence on the record as a whole, it is reversed.

### I.  Procedural History

On January 13, 2011, the Social Security Administration denied plaintiff's

September 22, 2010, application for DIB in which she claimed she became

disabled on August 23, 2010, because of irritable bowel syndrome (IBS), urinary

incontinence, headaches, hypertension, irregular heartbeat, depression, anxiety, asthma, and gastroesophageal reflux disease (GERD).  (Tr. 78, 89-95, 138-44, 182.)  At plaintiff's request, a hearing was held before an administrative law judge (ALJ) on October 16, 2012, at which plaintiff and a vocational expert testified.  (Tr. 29-63.)  On December 10, 2012, the ALJ issued a decision denying plaintiff's claim for benefits finding that plaintiff could perform other work as it exists in significant numbers in the national economy.  (Tr. 8-23.)[1]  On January 17, 2014, after reviewing additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 1-6.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole.  Plaintiff specifically argues that her mental impairment meets the criteria of Listing 12.07A(3) – Somatoform Disorders, and that the ALJ erred in failing to consider this condition as a severe impairment.  Plaintiff also contends that the ALJ erred in finding her subjective complaints not to be credible.  Finally, plaintiff argues that the ALJ failed to consider the vocational expert's testimony to the extent it

---

[1] In his decision, the ALJ also refers to an application for supplemental security income (SSI) that was purportedly filed by plaintiff in March 2011.  (*See* Tr. 11.)  The administrative transcript does not contain such an application or any initial ruling(s) by the Social Security Administration on an SSI application.  In their pleadings, the parties refer only to plaintiff's application for DIB.  In view of the record and the nature of the parties' pleadings, the Court considers plaintiff's application for DIB to be the only application before it on judicial review.

supported a finding that plaintiff's limitations would prevent her from performing

any work.  Plaintiff requests that the final decision be reversed and that she be

awarded benefits or that the matter be remanded for further consideration.  For the

reasons that follow, the matter will be remanded for further proceedings.

## II.  Testimonial Evidence Before the ALJ

1.      <u>Plaintiff's Testimony</u>

At the hearing on February 29, 2012, plaintiff testified in response to

questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was fifty-three years old.  Plaintiff was

five feet, seven inches tall and weighed between 235 and 245 pounds.  Plaintiff

was not married and had no children.  She lived with her brother and received

financial help from her relatives.  She attended college for one year.  (Tr. 34-36.)

Plaintiff's Work History Report shows that plaintiff worked as a

housekeeper in a hospital from January 1990 to May 1992.  From October 1994 to

July 2002, plaintiff worked as a staple machine operator in manufacturing.

Plaintiff was a seasonal worker in retail from November 2002 to January 2003.

From June 2004 to December 2008, plaintiff worked as a machine operator in auto

parts manufacturing.  (Tr. 269-74.)  Plaintiff was laid off from this job because the

company was downsizing.  Plaintiff thereafter applied for unemployment benefits.

(Tr. 38, 56.)  After obtaining work in a warehouse, plaintiff was fired in August

2009 because the work was fast-paced and she made too many mistakes. Plaintiff had this job for less than a month. (Tr. 36-38, 54.) Plaintiff then collected unemployment benefits, which ended in 2010 before she filed for disability. (Tr. 38, 57.)

Plaintiff testified that she applied for disability benefits because of worsening intestinal problems, heart problems, and lack of stamina. Plaintiff testified that she also had pain and swelling in her legs, knees, and ankles, which cause difficulty with standing. (Tr. 39-40.) She also experienced swelling in her hands and arms. (Tr. 42.)

Plaintiff testified that her intestinal problems require her to be near a bathroom and that she worries about this circumstance whenever she plans to do anything. Plaintiff testified that the urgency causes her to stop whatever she is doing and seek the bathroom. Plaintiff testified that she experiences this circumstance up to a dozen times a day, and no less than five times. Plaintiff testified that she needs to be within twenty-five feet of a bathroom. (Tr. 46-47.)

Plaintiff testified that she experiences swelling in her legs after she stands for an hour or two. The problem is especially significant in the right foot. Plaintiff takes medication and elevates her legs for two to three hours a day for the condition. Plaintiff also testified that her poor stamina limits her ability to engage in any activity, and that she must sit after about thirty minutes of activity and

elevate her foot. (Tr. 40-42.)

Plaintiff testified that she also has problems with her right arm in that repetitive use causes it to give out and the fingers and thumb of her right hand to become "stuck" in position, thus causing her to be unable to grip things. (Tr. 49.)

Plaintiff also testified that she experiences headaches that are triggered by fluorescent lights, headlights from oncoming cars, and neck strain when she moves her head from side to side. (Tr. 50.) Plaintiff testified that her left eye is somewhat immobile, which impedes her peripheral vision. Plaintiff testified that wearing bifocal glasses helps when she drives. (Tr. 57.)

Plaintiff testified that she has worsening problems with memory, concentration, and decision-making. Plaintiff testified that she panics when she cannot find things such as her keys or pocketbook. Plaintiff testified that she gets lost coming out of stores and panics when she cannot find her car. She avoids going to stores when they are crowded. (Tr. 43-44.) Plaintiff testified that she puts things off until the last minute because she feels she is "shoving the panic away" by doing so. Plaintiff testified that she has difficulty dealing with people – especially her relatives – because they do not understand her issues. (Tr. 51.)

Plaintiff testified that she experiences depression because of her physical and financial condition. Plaintiff testified that she is not as happy as she used to be and no longer has empathy. Plaintiff testified that she does not feel good about her

sister supporting her financially, knowing that the circumstance is putting a financial and emotional strain on her sister.  (Tr. 44-46.)

B.    Testimony of Vocational Expert

Mary Harris, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Ms. Harris classified plaintiff's past work as a machine operator and as a stapler as unskilled and medium.  (Tr. 60.)

The ALJ asked Ms. Harris to consider an individual of plaintiff's age, education, and work experience who could perform the full range of light exertional work except that she could not perform occupations that required peripheral acuity and was limited to simple, routine, and repetitive tasks with no production rate or pace work – meaning "no strict or fast paced production requirements although competitive requirements would still exist."  The ALJ asked Ms. Harris to further assume that the individual was limited to superficial interaction with the public and coworkers.  (Tr. 60-61.)  Ms. Harris testified that such a person could not perform plaintiff's past work but could perform other work in the economy such as light cleaner, of which 19,000 such jobs exist in the State of Missouri and 865,000 nationally; office helper, of which 6,500 such jobs exist in the State of Missouri and 200,000 nationally; and press tender, of which 6,800 such jobs exist in the State of Missouri and 342,000 nationally.  (Tr. 61.)

The ALJ then asked Ms. Harris to assume that the same individual would be off task greater than ten percent during the work period or would have more than two unscheduled or unexcused absences each month. Ms. Harris testified that such a person could not perform any job in the national economy. (Tr. 62.)

Counsel asked Ms. Harris to assume that the person would make greater than four errors performing simple, repetitive, and routine work. Ms. Harris testified that such a person could not perform any production-type work. (Tr. 62.)

### III. Medical Records Before the ALJ

Plaintiff visited the Hannibal Free Clinic on April 14, 2010, with reported concerns regarding her general health as well as concerns about her heart, asthma, and headaches. Plaintiff reported having health and financial stressors. Plaintiff reported her medical history to include heart palpitations/arrhythmias, edema, silent myocardial infarction, hypertension, and irritable bowel syndrome (IBS). Review of systems showed plaintiff to have the following complaints: fatigue, weakness, and weight gain since being laid off; a "lazy" left eye; dyspnea and occasional cough; chest pain that radiates to her right shoulder, palpitations mostly at night, dyspnea on exertion, heartburn, and edema; symptoms associated with IBS, including diarrhea and constipation, as well as genitourinary symptoms; arthritis in the right knee; dizziness with changes in position; and visual headaches that radiate to the right shoulder. No notes of examination were made. (Tr. 455-

58.)  Laboratory testing yielded results remarkable for cholesterol levels but otherwise were normal.  (Tr. 461-65.)  On April 20, plaintiff was treated at the Hannibal Clinic for chronic sinusitis, hypertension, and pharyngitis.  (Tr. 454.)

On May 18, 2010, plaintiff received treatment at the Hannibal Clinic for temporomandibular joint dysfunction (TMJ), sleep apnea, hypertension, pleurisy, pharyngitis due to rhinitis, episodic tachycardia, and resolving eczema.  Plaintiff was referred to a dentist for her TMJ condition.  Plaintiff's medications at that time included Bystolic, Lisinopril,[2] Loratadine,[3] Aquaphor, and Tylenol.  (Tr. 449-50.)

Plaintiff returned to the Hannibal Clinic on June 15, 2010, with complaints of ringing in her ears and headaches originating in her eyes.  Plaintiff reported her pain to be at a level five on a scale of one to ten.  Plaintiff was diagnosed with sinus headache and left lateral rectus (LR) palsy.  Plaintiff was instructed to continue with Loratadine and to take Nasonex.  (Tr. 448.)

Plaintiff visited the eye clinic at University Hospital & Clinics on July 30, 2010, after being told that she had "nerve palsy" that affected her eyes.  Plaintiff reported changes to her eye alignment and that she had a blind spot.  Plaintiff also

---

[2] Bystolic and Lisinopril are used to treat high blood pressure.  *Medline Plus* (last revised Aug. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a608029.html (Bystolic); *Medline Plus* (last revised Sept. 15, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692051.html> (Lisinopril).

[3] Loratadine is used to relieve the symptoms of hay fever.  *Medline Plus* (last revised Oct. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697038.html>.

reported experiencing pain.  It was noted that plaintiff failed the peripheral vision test for her driver's license.  Plaintiff reported having problems with her peripheral vision for years.  Upon examination, plaintiff was diagnosed with alternating exotropia, and plaintiff's eyeglass prescription was adjusted.  (Tr. 426-29.)

Plaintiff returned to the eye clinic on August 26, 2010, and underwent recession of the left lateral rectus and resection of the left medial rectus.  Plaintiff tolerated the procedure well.  (Tr. 436-43.)  During follow up examination on September 8, plaintiff reported continued soreness and some pain and strain when looking to the side.  Examination showed that plaintiff's condition had improved.  (Tr. 430-31.)

Plaintiff returned to the Hannibal Clinic on September 14, 2010, and reported her IBS to be worsening and that bladder leakage was likewise worsening.  Plaintiff also reported continued headaches.  Plaintiff's diagnoses included GERD, anxiety with possible obsessive compulsive disorder (OCD), fibromyalgia, and stress incontinence.  Plaintiff was noted to be "very somatic!!"  Oxybutynin[4] was added to plaintiff's medication regimen.  (Tr. 445-46.)

On October 12, 2010, plaintiff complained to the Hannibal Clinic that she had ear pain, chest pain, and pain in her right arm.  Tenderness was noted about the

_____

[4] Oxybutynin is used to treat overactive bladder. *Medline Plus* (last revised May 15, 2014) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682141.html>.

left acromioclavicular (AC) joint.  Plaintiff also reported that Detrol[5] did not help.

Plaintiff was noted to be very somatic.  Plaintiff denied any delusions or

hallucinations, and her cognition was noted to be intact.  Plaintiff was diagnosed

with anxiety, severe allergies, mixed incontinence, hypokalemia, GERD, and

hypertension.  Plaintiff was instructed to increase her dosage of Detrol and to

continue with her other medications.  Plaintiff was also prescribed Medrol dose-

pack.[6]  (Tr. 471.)  During follow up examination on October 26, plaintiff was

continued in her previous diagnoses and was also diagnosed with chronic otalgia/

possible trigeminal neuralgia, headache, anxiety/depression, and panic disorder.

Plaintiff was continued on her medications and Neurontin[7] was added to her

medication regimen.  (Tr. 469.)

Plaintiff visited the Hannibal Clinic on November 10, 2010, and reported

that she was sleeping better but continued to have pain in her head.  Plaintiff was

diagnosed with ankle swelling and neuropathy.  Plaintiff was instructed to wear an

ace bandage daily and to continue to take Neurontin.  It was questioned whether

plaintiff had sleep apnea.  (Tr. 467.)

---

[5] Detrol is used to treat overactive bladder.  *Medline Plus* (last revised Feb. 15, 2014)<http://
www.nlm.nih.gov/medlineplus/druginfo/meds/a699026.html>.

[6] Medrol is a corticosteroid used to relieve inflammation.  *Medline Plus* (last reviewed Sept. 1,
2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682795.html>.

[7] Neurontin is used to treat postherpetic neuralgia.  *Medline Plus* (last revised July 15, 2011)
<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html>.

On December 31, 2010, plaintiff underwent a consultative psychological consultation for disability determinations. (Tr. 507-12.) Licensed psychologist Patrick Finder observed plaintiff to initially be somewhat hesitant and angry and not to respond to "small talk." Plaintiff began to talk once the evaluation began but exhibited significant pressure in her speech and was extremely tangential. Dr. Finder observed plaintiff not to respond to questions and not to divert from what she wanted to talk about, which was her physiological symptoms. Dr. Finder observed plaintiff's affect to be "plastic" and that she avoided eye contact. Plaintiff was tearful a few times during the session and began to cry when she spoke of a younger sister who had died from a form of heart disease about four years prior. Plaintiff also reported that both her father and mother died from heart disease, and that her mother was fifty-two years old when she died. Plaintiff reported her own health history to include trauma to her right knee and a torn Achilles tendon when she was teenager, with continued pain in her knee. Plaintiff reported that her doctor advised that the knee is "bone on bone," and plaintiff stated that she could not put any pressure on the knee or stand for very long without pain. Plaintiff also reported having calcification on her ligaments and that she has been on a lifting restriction for the last two or three years. Plaintiff reported her health conditions to also include damage to her esophagus because of GERD, polyps on the colon that were removed, IBS, high blood pressure, arthritis,

lung infection, asthma, chronic heat exhaustion, severe headaches, and heart issues for which she needs a catheterization.  Plaintiff reported that her doctors have advised that there is nothing that can be done for her many physical issues, which causes her to feel hopeless and helpless.  It was noted that plaintiff took a significant amount of Tylenol on a daily basis despite being advised not to because of potential adverse effects.  Dr. Finder noted plaintiff's current medications to also include Neurontin, Lisinopril, and Bystolic.  As to her daily activities, plaintiff reported that she gets up between 7:00 and 10:00 a.m., does a few little things around the house, and mostly just sits and stares into space.  Plaintiff reported that she lives with a male friend; that "her son" does the heavy cleaning, such as vacuuming, mopping, and laundry; and that she has no hobbies.  (Tr. 507-10.)

Mental status examination showed plaintiff to be oriented times three and to have no difficulty with simple math problems, comprehension, or abstract thinking. Dr. Finder considered plaintiff to be of average intelligence.  Plaintiff was noted to be somewhat disheveled.  Her affect was extremely flat and she had a plastic look on her face throughout the evaluation.  Plaintiff had a fixed stare and looked across the room without ever making eye contact with Dr. Finder.  Dr. Finder noted there to be a significant amount of pressure in plaintiff's speech and that it was almost impossible to keep plaintiff focused or on target.  Plaintiff often talked over Dr. Finder and did not listen to questions, ignored the questions, or refused to answer

them.  Dr. Finder's attempts to redirect plaintiff were ineffective.  Plaintiff denied feelings of depression, but Dr. Finder noted plaintiff to exhibit some signs of depression such as flat affect, avoided eye contact, soft and low voice, difficulty with sleep, difficulty with appetite, loss of focus, and difficulty with concentration. Plaintiff denied any anxiety or symptoms of OCD and reported that she had no difficulty in public or any type of social phobia.  Dr. Finder noted plaintiff's conversations to be fixated on her physical problems and opined that plaintiff was displacing her emotional issues onto her physical problems.  (Tr. 510-11.)

Upon completion of the evaluation, Dr. Finder diagnosed plaintiff with hypochondriasis, concluding that plaintiff met the criteria for condition, and namely, being preoccupied with fears of serious disease that persist despite appropriate medical evaluation and reassurance, and significant distress caused by such preoccupation.  Somatization disorder was to be ruled out.  Dr. Finder assigned a Global Assessment of Functioning (GAF) score of 50.[8]  Dr. Finder observed that despite it appearing that plaintiff's numerous physical symptoms may be psychological in nature, they nevertheless had a serious impact on her ability to function.  (Tr. 511-12.)  Dr. Finder concluded:

At this point in time, given her presentation in the interview, it is

---

[8] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness."  *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. Text Revision 2000).  A GAF score between 41 and 50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).

doubtful that she would be employable. At the same time, she is not
involved in any type of mental health treatment and not taking any
type of psychotropic medication. She refuses to acknowledge any
psychological issues and blames everything on her physical problems.
It is not known whether she would be open to any type of mental
health treatment or psychological intervention. If she would consent
to mental health treatment, it is felt there is a good possibility that her
conditions might improve significantly.

(Tr. 512.)

On January 13, 2011, Stanley Hutson, Ph.D., a psychological consultant

with disability determinations, completed a Psychiatric Review Technique Form in

which he opined that plaintiff's mental impairment was not severe in that her

depression and anxiety/panic disorder caused only mild restriction in activities of

daily living; mild difficulties in maintaining social functioning and in maintaining

concentration, persistence, or pace; and resulted in no repeated episodes of

decompensation of extended duration. (Tr. 474-84.)

Plaintiff returned to the Hannibal Clinic on March 16, 2011, and complained

of ear pain, difficulty breathing, and cough. Plaintiff was diagnosed with TMJ,

otitis externa, trigeminal neuralgia, and vasomotor instability. Plaintiff was

instructed to increase her Neurontin. (Tr. 495-96.)

Plaintiff visited Dr. Scott Simmons on September 29, 2011, for a refill of

blood pressure medication. Plaintiff also complained of headaches. Dr. Simmons

noted plaintiff's current medications to include Neurontin, Bystolic, and Lisinopril/

HCTZ. Upon examination, Dr. Simmons diagnosed plaintiff with moderate

maxillary sinusitis, edema, rosacea/acne, and left eye pain. Plaintiff was instructed to start Nasonex and was referred to an eye clinic. (Tr. 486.)

Plaintiff returned to Dr. Simmons on October 13, 2011, and complained of sinus congestion, ear pain, and headache. Plaintiff reported the headache to have begun four days prior. Physical examination showed tenderness about the scalp with palpation but no sinus tenderness. Examination of the ears was normal as was examination of the chest and lungs. Plaintiff was prescribed an antibiotic and prednisone. Dr. Simmons also noted plaintiff to have mild carpal tunnel syndrome of the right wrist, but plaintiff declined a wrist splint. (Tr. 487-89.)

Plaintiff underwent an additional psychological consultation with Dr. Finder in January 2012 for disability determinations. (Tr. 513-18.)[9] Dr. Finder observed plaintiff to be morbidly obese and to have some difficulty in rising, walking, and sitting. Plaintiff responded appropriately and talked freely throughout the evaluation. Plaintiff continued to talk at the conclusion of the evaluation, and Dr. Finder found it difficult to escort her from the office because of her continued talking. Dr. Finder noted it to be difficult to get plaintiff to talk about anything other than her physical health complaints. Dr. Finder noted plaintiff's

---

[9] Although Dr. Finder's report of this consultation is dated January 19, 2011, plaintiff avers that the consultation actually occurred on January 19, *2012*. In this report, Dr. Finder noted plaintiff to be one year and one month older from the time of his previous consult, and he referred to his previous consult as occurring about one year prior. That consultation occurred in December 2010. The undersigned considers the instant consultation to have occurred in January *2012*, therefore, and not in January 2011.

conversations to be pressured and tangential. Plaintiff's affect was flat, but she maintained good eye contact. Plaintiff became tearful at times during the evaluation. She reported on her health conditions, including continued pain in her right knee, and reported that her doctors were unwilling to perform a knee replacement because she was too young. Plaintiff reported additional health conditions since her last evaluation, and specifically, gall bladder removal, pain in her neck and jaw, hearing loss, difficulty with balance and coordination due to her right leg being shorter than her left, and lactose intolerance. Plaintiff continued to report that her physicians have told her that they can do nothing for her illnesses, which causes her to feel hopeless about ever getting better or being able to work again. Plaintiff reported that she does not like to take prescription pain medication but takes ibuprofen throughout the day. Plaintiff also reported that she was prescribed antidepressants about one year prior but stopped taking them because of side effects. Dr. Finder noted plaintiff's current medications to be Neurontin, Detrol, and Lisinopril. As to her daily activities, plaintiff reported that she lives with her brother and does little throughout the day. Plaintiff reported that she cannot do things that involve her back because of severe pain she experiences due to vertebrae in her back that rub together. Plaintiff reported that she enjoys television but cannot watch for very long because it bothers her eyes. Plaintiff reported that she no longer likes to leave the house because she feels people are

looking at or talking about her.  (Tr. 513-16.)

Mental status examination was essentially unchanged from the previous evaluation, with the exceptions that plaintiff was relatively neat in appearance and dress, and she maintained good eye contact.  Dr. Finder noted plaintiff to continue to exhibit signs of depression, including flat affect, tearfulness, difficulty with sleep and appetite, difficulty with concentration and focus, and irritability. Plaintiff denied most symptoms of anxiety and reported having no difficulty in social situations or dealing with crowds.  Dr. Finder diagnosed plaintiff with hypochondriasis and dysthymic disorder.  Somatization disorder was to be ruled out.  Dr. Finder continued in his GAF score of 50.  (Tr. 516-17.)  Dr. Finder noted that plaintiff continued to be preoccupied with fears of various illnesses and that such preoccupation was causing significant distress for her, noting that "[w]hatever the source of her health fears, they are having a serious impact on her ability to function."  (Tr. 518.)  Dr. Finder concluded:

> As last year, it needs to be pointed out that she is not involved in any type of mental health treatment and not on any type of medication for depression or anxiety.  She more or less refuses to acknowledge her symptoms of depression and blames all of her problems on her physical health conditions.  She did report to trying one antidepressant but believed it was causing side-effects and stop[ped] the medication. She was not involved in any type of counseling.  The medication may or may not have caused side effects.  Her perception of the side effects could well be part of the hypochrondriacal [sic] process.
>
> Given her presentation, however, it is not expected that she would be employable.

(*Id.*)

Plaintiff visited Dr. Simmons on March 13, 2012, and complained of cough and congestion and a recent onset of ear pain. Dr. Simmons noted plaintiff's medications to include Bystolic, Levaquin (an antibiotic), Lisinopril/HCTZ, Nasonex, and Neurontin. Physical examination was normal in all respects. Dr. Simmons diagnosed plaintiff with bronchitis and otitis media. Plaintiff was instructed to call if her symptoms persisted or worsened. (Tr. 490-91.)

On August 31, 2012, plaintiff visited Dr. Simmons seeking treatment for a recent insect bite. Physical examination was normal. No rashes, lesions, or discoloration were noted. Plaintiff was instructed to call if her symptoms persisted or worsened. (Tr. 492-93.)

On September 21, 2012, Dr. Finder completed a Mental Medical Source Statement of Ability to Do Work-Related Activities (Mental MMS) in which he opined that plaintiff's impairment affected her ability to understand, remember, and carry out instructions. Dr. Finder specifically opined that plaintiff was mildly limited in her ability to understand and remember simple instructions and moderately limited in her ability to carry out simple instructions; to understand, remember, and carry out complex instructions; and to make judgments on simple and/or complex work-related decisions. Dr. Finder also opined that plaintiff's impairment affected her ability to interact, specifically opining that plaintiff was

moderately limited in her ability to interact appropriately with the public, with supervisors, and with coworkers; and to respond appropriately to usual work situations and changes in a routine work setting. Dr. Finder explained that plaintiff was "extremely preoccupied with physical health issues[,which ] negatively impacts her ability to focus on things outside of herself." Dr. Finder further explained that he believed many of plaintiff's physical complaints were psychosomatic in nature and that such physical complaints limited her ability to engage in many aspects of daily life. Dr. Finder reported that plaintiff's bio-psychosocial history and mental status examination supported his conclusion. Finally, Dr. Finder agreed that plaintiff's disability onset date was August 23, 2010. (Tr. 503-05.)

## IV. Additional Evidence Considered by the Appeals Council[10]

Plaintiff visited Dr. Simmons on September 26, 2012, with complaints relating to chest and sinus congestion. Physical examination was normal in all respects. Plaintiff was diagnosed with acute sinusitis and was instructed to call if symptoms worsened or persisted. (Tr. 524-26.)

## V. The ALJ's Decision

---

[10] In determining plaintiff's request to review the ALJ's decision, the Appeals Council considered additional evidence that was not before the ALJ at the time of his decision. The Court must consider this evidence in determining whether the ALJ's decision is supported by substantial evidence. *Frankl v. Shalala,* 47 F.3d 935, 939 (8th Cir. 1995); *Richmond v. Shalala,* 23 F.3d 1441, 1444 (8th Cir. 1994).

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through March 31, 2014. The ALJ found plaintiff not to have engaged in substantial gainful activity since August 23, 2010, the alleged onset date of disability. The ALJ found plaintiff's severe impairments to be obesity, status post exotropia, anxiety, stress incontinence, fibromyalgia, GERD, depression, panic disorder, schizoaffective disorder, OCD, panic disorder with agoraphobia, and borderline personality disorder, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13-14.)[11] The ALJ found plaintiff to have the RFC to perform light work[12] "except no peripheral acuity; limited to simple routine repetitive tasks; no production rate or pace work although competitive production requirements would still exist; and superficial interaction with public coworkers [sic]." (Tr. 16.) The ALJ found plaintiff unable to perform her past relevant work. Considering plaintiff's age, education, work experience, and RFC, the ALJ determined that vocational expert testimony supported a finding that plaintiff could perform other work as it exists in

---

[11] With respect to plaintiff's mental impairments, the ALJ stated that he specifically considered Listing 12.04 – Affective Disorders, Listing 12.06 – Anxiety Related Disorders, and Listing 12.08 – Personality Disorders. (*See* Tr. 14.)

[12] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

significant numbers in the national economy, and specifically, cleaner, office helper, and press tender.  The ALJ thus found plaintiff not to be under a disability from August 23, 2010, through the date of the decision.  (Tr. 21-23.)

## VI.  Discussion

To be eligible for DIB under the Social Security Act, plaintiff must prove that she is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  At Step 1, the Commissioner considers whether the claimant is engaged in substantial gainful activity.  If so, disability benefits are

denied.  At Step 2, the Commissioner decides whether the claimant has a "severe" medically determinable impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.  If the impairment(s) is severe, the Commissioner then determines at Step 3 whether such impairment(s) is equivalent to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) meets or equals one of the listed impairments, she is conclusively disabled.  At Step 4, the Commissioner establishes whether the claimant's impairment(s) prevents her from performing her past relevant work.  If the claimant can perform such work, she is not disabled.  Finally, if the claimant is unable to perform her past work, the Commissioner continues to Step 5 and evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  The claimant is entitled to disability benefits only if she is not able to perform other work.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test,"

however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even

though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

In this case, the ALJ erred by failing to consider plaintiff's diagnosed condition of hypochondriasis as a severe mental impairment and by failing to consider the impact of this impairment when assessing plaintiff's credibility and RFC. The final decision of the Commissioner must therefore be reversed and the matter remanded for further proceedings.

At Step 2 of the sequential analysis, the ALJ found plaintiff's severe impairments to be obesity, status post exotropia, anxiety, stress incontinence, fibromyalgia, GERD, depression, panic disorder, schizoaffective disorder, OCD, panic disorder with agoraphobia, and borderline personality disorder. Other than generally referring to Dr. Finder's diagnosis of "hypochondria" in determining plaintiff's RFC at Step 4, the ALJ did not discuss plaintiff's diagnosed condition of hypochondriasis or its effect on her functioning, despite substantial evidence on the

record related thereto.

According to the *Diagnostic & Statistical Manual of Mental Disorders* (4th ed. Text Revision 2000) (DSM-IV-TR), the essential feature of hypochondriasis "is preoccupation with fears of having, or the idea that one has, a serious disease based on a misinterpretation of one or more bodily signs or symptoms." DSM-IV-TR 504. "The unwarranted fear or idea of having a disease persists despite medical reassurance[,]" and such "preoccupation with bodily symptoms causes clinically significant distress or impairment in social, occupational, or other important areas of functioning[.]" *Id.* Hypochondriasis is within the class of somatoform disorders. *Id.* at 485. *See also Smith v. Chater*, 81 F.3d 165 n.2 (8th Cir. 1996) (unpublished) (per curiam) (table).

> The common feature of the Somatoform Disorders is the presence of physical symptoms that suggest a general medical condition . . . and are not fully explained by a general medical condition, by the direct effects of a substance, or by another mental disorder . . . . [T]he physical symptoms are not intentional (i.e., under voluntary control).

DSM-IV-TR at 485. Hypochondriasis is a nonexertional impairment that may affect a claimant's exertional abilities. *Webber v. Secretary of Health & Human Servs.*, 784 F.2d 293, 299 (8th Cir. 1986).

As outlined above, the record shows plaintiff to have claimed and reported numerous physical ailments to her providers, both treating and consulting, as well as in her hearing testimony and in her disability application. Such ailments include

IBS, urinary incontinence, headaches, hypertension, irregular heartbeat, allergies, GERD, polyps on the colon, arthritis, calcification of ligaments, lung infection, asthma, chronic heat exhaustion, heart issues for which she needs a catheterization, sinusitis, sleep apnea, fibromyalgia, neuralgia, eye pain, ear pain, swelling, musculoskeletal pain, and general loss of stamina.  When plaintiff returned to Dr. Finder in January 2012, one year after her initial consultation with him, she reported having suffered from additional ailments within that year, and namely, gall bladder removal, neck and jaw pain, hearing loss, difficulty with balance and coordination, and lactose intolerance.  While the medical record provides little objective support for this list of physical ailments, the ALJ had before him an uncontradicted diagnosis of hypochondriasis rendered twice by a licensed psychologist, with subjective support by plaintiff's treating health providers that plaintiff was "very somatic" during her examinations for physical complaints.  As noted above, this mental impairment causes plaintiff to believe that her physical ailments are more serious than the clinical data would suggest, and she cannot control this belief.  In both of his consultation reports, Dr. Finder detailed his clinical observations of plaintiff's manifestation of this impairment, including her preoccupation with her many reported physical ailments, her report of activities being limited because of her physical condition, and her subjective denial of any mental issues despite exhibiting symptoms objectively observed by Dr. Finder.

Indeed, Dr. Finder noted plaintiff to "refuse[] to acknowledge any psychological issues and blame[] everything on her physical problems." (Tr. 518.) Because of plaintiff's firm belief that her issues involved only physical problems, Dr. Finder questioned whether plaintiff would even participate in any type of mental health treatment for her mental impairment.

Despite this objectively supported diagnosis of hypochondriasis with findings that plaintiff was significantly limited thereby, the ALJ only referred to this impairment in a cursory manner and appeared to dismiss its significance because of plaintiff's subjective denial of psychological symptoms, her lack of mental health treatment, her perceived lack of cooperation during Dr. Finder's evaluations, and her satisfactory performance on diagnostic tests. (*See* Tr. 18-20.) These reasons provided by the ALJ to diminish the significance of plaintiff's mental impairment are actually indicative of the mental impairment itself. To discount the diagnosis for these reasons "misses the point of [plaintiff's] serious mental problem." *Easter v. Bowen,* 867 F.2d 1128, 1130 (8th Cir. 1989). It cannot be said, therefore, that the ALJ adequately considered plaintiff's diagnosed mental impairment of hypochondriasis when he determined her severe impairments at Step 2 of the sequential analysis.[13]

_____

[13] Curiously, the ALJ did not include this diagnosed and objectively supported mental impairment as a severe impairment at Step 2 of the sequential analysis, but included other mental impairments that enjoy no similar support in the record, such as schizoaffective disorder, panic disorder with agoraphobia, and borderline personality disorder. In addition, later in his decision,

The ALJ's failure to adequately consider the impact of plaintiff's hypochondriasis likewise affected his credibility determination and resulting RFC assessment.  The ALJ determined to credit plaintiff's subjective complaints only to the extent "the objective medical evidence of record allow[ed]" and found plaintiff's extreme allegations to simply not be supported by the record.  (Tr. 19.)  Specifically, the ALJ noted plaintiff's medical treatment to be limited and conservative in nature, that plaintiff's vision testing yielded normal results after eye surgery, that plaintiff's musculoskeletal complaints were not supported by physical examination or clinical findings, that plaintiff's diagnosis of fibromyalgia was unsupported by any findings of actual pressure points, and that the record was sparse as to results of physical examinations.  (Tr. 18-20.)  However, given the nature of the somatoform disorder with which plaintiff was diagnosed, "[a]ny shortcomings in the objective medical data that support her alleged physical ailments are irrelevant since her primary disorder, as clinically diagnosed, causes her to exaggerate her physical problems in her mind beyond what the medical data indicate."  *Easter*, 867 F.2d at 1130.

The ALJ also discredited plaintiff's subjective complaints because of the inconsistency in her reports regarding her work history and her reasons for stopping work.  (Tr. 19.)  The ALJ specifically noted plaintiff's testimony that she

---

the ALJ noted no evidence of record to support plaintiff's diagnosis of fibromyalgia (Tr. 20), but

was laid off in 2008, received unemployment benefits, worked again for less than one month, was fired for her difficulty to get along with coworkers and to keep up with the pace of work, and thereafter again received unemployment benefits. The ALJ noted that this recitation was inconsistent with plaintiff's testimony that she sought "similar work" when she was unemployed and her report to Dr. Finder that she enjoyed working and stopped when her employer closed the factory. (*Id.*) There is no substantial inconsistency in these reports. Plaintiff testified that she sought "familiar" work "in automotive kinds of things" when she was unemployed, including work that did not involve a lot of contact with people and that did not require higher skills. (Tr. 55-56.) There is no indication in plaintiff's testimony or elsewhere that she sought work similar to the fast-paced warehouse work she performed short-term from which she was fired. To the extent plaintiff's report to Dr. Finder that she lost her job in 2008 when the factory closed conflicts with her testimony that the company was downsizing, this isolated inconsistency does not rise to the level of substantial evidence sufficient to support a decision to discount plaintiff's subjective complaints. *See Burress v. Apfel*, 141 F.3d 875, 881 (8th Cir. 1998).[14]

---

he nevertheless determined this impairment to be severe at Step 2.

[14] In her Brief in Support of the Answer, the Commissioner suggests that plaintiff's receipt of unemployment benefits and seeking other employment "cast doubt on her motivation for seeking disability benefits," citing *Cox v. Apfel*, 160 F.3d 1203, 1208 (8th Cir. 1998), for its holding that accepting unemployment benefits entails an assertion of an ability to work and is inconsistent with a claim of disability. (Deft.'s Brief, Doc. #21 at pp. 10-11.) Plaintiff last received

The ALJ also determined plaintiff's daily activities of cooking simple meals, performing light household chores, shopping, and enjoying supportive social relationships with her family and a "close interpersonal relationship with a boyfriend" to be inconsistent with her subjective complaints of disabling limitations. (Tr. 20.) It is well established, however, that a claimant "need not be completely bedridden or unable to perform any household chores to be considered disabled." *Easter*, 867 F.2d at 1130; *see also Reed v. Barnhart*, 399 F.3d 917, 922-24 (8th Cir. 2005); *Burress*, 141 F.3d at 881. Nor does a claimant's ability to maintain a relationship with her family discredit subjective claims that she does not tolerate crowds or relate well with coworkers. *See, e.g., Tate v. Apfel*, 167 F.3d 1191, 1199 (8th Cir. 1999). Finally, there is no evidence in the record to support the ALJ's factual finding that plaintiff was in a "close interpersonal relationship with a boyfriend." Nevertheless, the daily activities recited by the ALJ provide an insufficient basis upon which to find plaintiff's complaints of disabling symptoms not to be credible. In circumstances where, as here, a claimant is diagnosed with a form of somatoform disorder such as hypochondriasis, her exaggeration of symptoms and a lack of objective medical evidence supporting such symptoms are not good reasons to discredit her complaints. *See Tedford v. Colvin*, No. C12-

---

unemployment benefits during the first quarter of 2010. (Tr. 38, 57, 150-51.) Plaintiff alleges that she became disabled on August 23, 2010. As such, contrary to the Commissioner's suggestion, it cannot be said that plaintiff accepted unemployment benefits at a time when she claimed she was disabled.

4076-LTS, 2013 WL 3338477, at *16 (N.D. Iowa July 2, 2013).

When assessing plaintiff's RFC, the ALJ accorded great weight to the Mental Medical Source Statement ("MSS") completed by Dr. Finder in September 2012 wherein he opined that plaintiff experienced only mild to moderate limitations in her ability to perform the mental requirements of work. (Tr. 20.) While Dr. Finder's Mental MSS contained his opinion as to plaintiff's *mental* ability to perform work, it did not address her ability perform *physical* work-related activities, which is the type of activity most affected by a somatoform disorder. *Tedford*, 2013 WL 3338477, at *16. Indeed, plaintiff reported during her evaluations with Dr. Finder that she was physically limited in her ability to stand, bend, and engage in other exertional activities; and Dr. Finder concluded from these evaluations that although plaintiff's physical symptoms were psychological in nature, they nevertheless seriously impacted her ability to function. Indeed, in his Mental MSS to which the ALJ accorded great weight, Dr. Finder reported that plaintiff's *physical* complaints, albeit psychosomatic, limited her ability to engage in many aspects of daily life. Other than discrediting plaintiff's subjective physical complaints, however, the ALJ did not address the extent to which plaintiff's physical abilities were affected by her mental impairment, despite Dr. Finder's reported observations. The ALJ's failure to specifically address plaintiff's physical ability to function is especially significant here inasmuch as, as noted by the ALJ,

the record contains no medical assessment regarding her physical limitations.

In sum, the ALJ's Step 2 finding and credibility determination failed to take into consideration the nature of plaintiff's diagnosed mental impairment of hypochondriasis, a somatoform disorder as defined in the DSM-IV-TR, and its impact on plaintiff's ability to perform the mental and physical requirements of work. Because the ALJ's RFC determination must be based on plaintiff's ability to perform the requirements of work "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world," *McCoy v. Astrue*, 648 F.3d 605, 617 (8th Cir. 2011) (internal quotation marks and citation omitted), it cannot be said that the ALJ's RFC assessment here is supported by substantial evidence on the record as a whole where he failed to consider the primary source of plaintiff's alleged disability. *See also Easter*, 867 F.2d at 1130 (noting that employers are concerned with an employee's "substantial capacity, psychological stability, and steady attendance[.]").

This matter will therefore be remanded so that plaintiff's medically determinable and diagnosed mental impairment of hypochondriasis can be taken into account at Step 2 of the sequential analysis; can be properly considered at Step 3 in determining whether this impairment, considered alone and in combination with plaintiff's other impairments, meets or medically equals a listed impairment, including Listing 12.07 – Somatoform Disorders; and can properly be taken into

account at Step 4 in determining plaintiff's credibility and RFC, given its nature of producing physical symptoms and a preoccupation with fear of having a serious disease based on a misinterpretation of such symptoms, but without a full medical explanation. Against this backdrop, the ALJ will reassess plaintiff's credibility as well as the credibility of third-party observations; and shall reassess plaintiff's RFC based on the relevant and credible evidence of record relating to plaintiff's severe and non-severe impairments, including medical and non-medical evidence as well as plaintiff's own description of her symptoms and limitations. 20 C.F.R. § 404.1545(a). If necessary, the ALJ may obtain additional medical evidence and conduct another hearing to more fully develop the record regarding plaintiff's hypochondriasis.

Accordingly, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 13th day of January, 2015.

   /s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE